[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. The Resolution of Disputed Values of Property
A. No. 3 Emerson Lane, Granby, CT.
Plaintiff on his financial affidavit valued the family home at $225,000. In his testimony he stated that in January 1992, at a time when he had planned to purchase a new home as part of a reconciliation with defendant, he had contracted to sell the property for $210,000. The agreement later disintegrated along with the reconciliation effort. He offered no expert testimony as to its value.
Defendant produced a written appraisal of the property by Karen McDunnah, a licensed real estate appraiser, who valued the home at $184,000, the amount used on defendant's financial affidavit.
This court determines the value of said property to be $191,000.
B. No. 1 Industrial Road, Windsor Locks, CT.
John C. Koseian, a qualified real estate appraiser for the plaintiff, valued this industrial use property at $309,300 as of November 19, 1992.
M. Damien Walsh, also a qualified real estate appraiser, in testifying on behalf of the defendant found CT Page 45 the value of the property as of October 20, 1992 to be $641,000. Mr. Walsh also stated that property values in the area were depreciating at the rate of .6 percent per month, a conclusion with which this court was in complete agreement.
Both appraisers were experienced and knowledgeable; each had sensible reasons for reaching his conclusion. This court, after first applying a factor of -.6 per cent per month to each appraisal to bring each of them to date, finds the present value of the property to be $470,350.
C. No. 6 Industrial Park, Windsor Locks, CT.
Appearing here also for the plaintiff, John C. Koseian valued their industrial parcel at $1,044,100 as of November 19, 1992.
M. Damien Walsh, again testifying for the defendant, found the value of the property as of October 20, 1992 to be $1,315,000.
As previously stated, both witnesses favorably impressed this Court. After bringing the appraisal of each witness current by applying a factor of -.6 per cent per month to their values, it is found that the present value of the subject premises is $1,168,500.
D. Windsor Marketing Group (WMG)
This business is the most significant asset in the marital estate, and its value not suprisingly is the most controversial. Begun in 1978 by plaintiff, it is involved in the formulation of marketing programs for large retail chain stores which sell food or home products. Plaintiff owns 800 shares of common stock in the company, representing 80 per cent of the outstanding shares. The remaining 200 shares are owned by Edward Tessier, once an employee of and presently an officer in the company who acquired his interest in 1985.
Plaintiff, employing as a base the book value of WMG as of March 28, 1992 i.e. $905,932, calculated the value of his 80 per cent interest at $724,745, as reflected in his financial affidavit. CT Page 46
Stephen L. Vecchitto, a certified public accountant with membership in various reputable accounting and appraisal societies who has in the past appeared before this Court, testified on behalf of the defendant. Mr. Vecchitto's approach to the problem was to appraise the value of the business by three traditional methods, to assign a weight (degree of reliability) to each, and with those findings mathematically determine the value of plaintiff's interest in the business. Using the capitalization of earnings method he found the value of the company to be $1,009,960 and assigned a weight of .55 to that figure. In employing the capitalization of excess earnings method he established the value of WMG at $1,597,986 and set a weight of .35 for it. Lastly, using the "prior company transactions" method, he found the value of the company to be $1,332,660 and gave that finding a weight of .10. Finally, applying in each case the assigned weight as a percentage of that previously determined value, he determined that the value of the business was $1,248,039 or $1,250 per share. He concluded that plaintiff's 800 shares had a value of $1,000,000.
In rebuttal Thomas F. Owens Jr., a certified public accountant and partner in the Springfield, Mass. office of Coopers and Lybrand, a big six accounting firm and accountant for plaintiff's company, appeared before the court on his behalf. His testimony for the most part involved an analysis and critique of Mr. Vecchitto's report and findings, the major criticism centering on his failure to consider capital expenditures in excess of depreciation for purposes of valuation. Citing the problems on WMC's financial horizon because of potentially damaging legislation, he stated that "I would have adjusted normalized earnings downward to take into account the money needed for capital improvements for asset replacement; there should be a reserve on the balance sheet." Using Mr. Vecchitto's formula and taking into account what he considered to be needed capital expenditures, he concluded that the value of the company as of March 28, 1982 would be $500,000.
After weighing all the evidence on this complicated and troublesome issue, it is found that the most reliable means of valuation, the method which this CT Page 47 court feels most confident and comfortable in adopting, is the capitalization of earnings procedure set forth in detail in Mr. Vecchitto's report (Exhibit defendant 9). It is therefore concluded that the present value of Windsor Marketing Group is $1,009,960 and that plaintiff's 80 per cent interest has for marital estate purposes a present value of $807,968, rounded off at $808,000.
III. The Marital Assets of the Parties
Plaintiff (husband)
One-half interest in No. 3 Emerson Lane $45,048 Granby, CT Total Value $191,000 Less Mortgage -100,000 Total Equity $90,096 One half interest $45,048
Condominium at No. 18 Whitward, Unit 18 ($5,000) Windsor, CT Total Value $130,000 Less Mortgage -$135,000 Total Equity ($5,000)
Whole interest in No. 2 Industrial Rd. $84,053 Windsor Locks, CT Total Value $470,350 Less Mortgage -$386,297 $84,053
One-half interest in No. 6 Industrial Park $76,151 Windsor Locks, CT (T. A. Development) Total Value $1,168,500 Less Mortgage -$1,016,198 Total Equity $152,302 One-half Interest $76,151
Windsor Marketing Group (business) $758,000 Total Value $808,000 Less Value on Date of Marriage of the Parties -$50,000 $758,000 1989 Alpha Spider $6,000 CT Page 48 1991 Ford F150 $8,000 Bank Accounts $11,803 I.R.A. Westbank $20,687 Household Furniture — TOTAL $1,004,742
Defendant (Wife) One-half interest in No. 3 Emerson Lane $45,048 Granby, CT 1990 Volvo $13,225 Household Furniture — Bank Accounts $2,421 I.R.A. Suffield Savings $22,546 TOTAL $83,240
Total Marital Estate $1,087,982
IV. A Review and Evaluation of the Evidence in Accordance with the Provisions of Sec. 46b-81c, C.G.S.
The plaintiff husband, who is 36 years of age, and the defendant wife, who is 35, were married July 7, 1979, thirteen years ago. They have one child, a son Daniel, born June 18, 1987 and now five years old.
While plaintiff suffers from dyslexia and has difficulty reading, he managed to graduate from Bentley College in three years. His employment record over the years bears out the court's observation that he is an unusually capable and dedicated business man who is not averse to hard work. At the time of his marriage he was operating a small concern known as O.K. Sales which manufactured supermarket signs. His statement that the business had a value of $50,000 at that time has been accepted by the Court. Later, in 1983 his establishment, then known as K.P.A. Enterprises, became incorporated; it adopted its present name, Windsor Marketing Group when it was moved from Springfield, Mass. to its present location in Windsor Locks, CT. Plaintiff is president of the company and owns 80 per cent of the outstanding stock, having sold a 20 per cent share to one of his valued employees in 1985. There are presently 110 employees.
The exact nature of plaintiff's business was best described by defendant who testified that "they CT Page 49 manufacture point of sale products. He doesn't sell signs — he sells a service. They go into a grocery store, do a market analysis of the area, evaluate the image people have of the store, then recommend the type of signs the stores should have." Plaintiff's accountant described him as a "hands on person who gets to work early, puts a lot of shoulder to it, has a beeper with him and can be located at 7 P.M." Plaintiff's efforts are reflected in the company's gross sales of over $7,300,000 for the year ending March 28, 1992. Plaintiff expressed some concern for the future of his business because of recent legislation relating to bar codes on merchandise which would require the acquisition of expensive new equipment. Plaintiff's financial affidavit reflects an annual income of $98,000 and additional annual rental income of $5,000. He has also received an annual bonus, the amount for 1992 being $8,000. His 1991 federal income tax return indicates a total income for him of $102,505. Defendant helped out in plaintiff's business in varying degrees while they were together. The extent of her involvement was in dispute throughout the trial. It is found that plaintiff was the driving force responsible for the success of the company.
At the time of their marriage defendant had recently graduated from Western Connecticut State College with an A.A. degree and was then attending Western New England College from which she graduated in 1980 with a B.A. degree in psychology. She remarked that at the time of her marriage she had a car worth $50, about $2,000 in the bank, and $8,000 in student loans. Her first and only full time employment began in 1980 at the Hartford Insurance Group where she was hired as an underwriter trainee at an annual salary of $13,000. Her employment record there was outstanding. She received annual raises, earned $33,586 in 1986, and at the time she left the company in 1987 shortly before the birth of their child was a business analyst and manager charged with developing procedures for line operations. A former supervisor testified that defendant was "one of the most talented and capable people I've worked with — she was rated at the top — she was walking on corporate water." Defendant is presently enrolled in a part time "look forward" program at Manchester Community College and is unemployed. She expressed a desire to make a career CT Page 50 change and to obtain a Ph.D. degree in marriage and family counselling. While defendant is actively seeking employment, the outlook in the insurance industry is bleak because of "high level cut backs" in the field. She recently refused an offer of employment as a clerk at a rate of $6 per hour. She summed up her present feelings about employment by stating "I helped my husband build his business, now I'd like to have my own chance — my own private practice in psychology."
Health
As previously mentioned, plaintiff suffers from dyslexia but is otherwise in apparent good health.
Defendant has suffered from periods of depression at various times during the marriage, commencing in February, 1982. She described her condition at that time as follows: "My job was stressful but I continued working. I had a chemical imbalance. There was an unhappiness inside of me. I was sad. The depression strained our marriage. My husband was working 80-100 hours a week. He'd come home for dinner and then go back to work. He didn't have much time for me." Since the separation of the parties in 1989, incidents of depression have returned. Defendant is presently under treatment with a psychologist and is taking prescription drugs for her condition.
Fault
Before this issue is discussed, a brief history of the marriage is in order. The parties first met on June 10, 1977 and were married two years later. They first lived in Springfield, Mass. where plaintiff's business was then located. Later they moved to Connecticut, purchasing their present home in Granby in 1984. The parties separated April 22, 1989. Several attempts at a reconciliation followed, resulting in two failed efforts on plaintiff's part to purchase a new marital home. On this subject defendant stated "Each time I decided not to go through with the purchase. My mind was shutting down. My body said no. My husband was willing to reconcile at that time." The present action was instituted in February, 1990, almost three years ago. CT Page 51
Plaintiff's version summarized
"She has had three or four periods of depression since 1982. We were always arguing. I wanted a family — she didn't — she said she wasn't ready. We'd plan a romantic dinner. I'd come home to find her locked in her bedroom and wanting nothing to do with me. This happened 20 to 25 times between 1984 and 1988. In bed she'd have 4 or 5 pillows, between us. She said she missed her teddy bear. She'd come home from work at 3 P.M. — 4 P.M., go to bed, and sleep until the following morning. She would be poised outside or at work and a completely different personality at home. I know I have a loud voice which might have activated her. My biggest problem was not being punctual because of my business. At times I did punch my fist out of clear frustration." He concluded by stating "I should have put my foot down during the seven years prior to the breakdown. I went to counselling to learn how to adjust to her. I don't feel I did anything wrong."
Defendant's version summarized
"While he never hit me during our marriage, he was at times physically intimidating. He would restrain me when we were arguing. He'd take things out on inanimate objects. After our separation these episodes increased. In November 1991 he kicked the walls outside the house when he couldn't get in. On July 19, 1992 during an argument he tore a bag out of my hand and wouldn't let me enter the house. As a result the police were called." With reference to their sex life she testified that "it became less frequent as the years passed. At time I criticized him. I suggested he seek the services of a prostitute." With reference to her present feelings she testified that "I caused him pain during the reconciliation period, I feel good now, have accepted our differences and have started loving myself. I learned a lot from him during my marriage. He was patient with me. My spiritual beliefs have increased ten fold. He was a big part of my life — he was my soul-mate."
After considering all the evidence on the subject of fault, it is found that responsibility for the CT Page 52 irretrievable breakdown of the marriage rests with the defendant.
Other factors to be considered
It is further found that plaintiff contributed the lion's share in the growth of the Windsor Marketing Group, the principal asset in the marital estate and that he has a better opportunity than does defendant for the future acquisition of capital assets and income.
After reviewing and weighing all of the evidence as it pertains to Sec. 46b-81c C.G.S., and after giving particular attention to such predominating factors as the length of the marriage, the health of the parties, their vocational skills, employability and sources of income, their future financial outlook, their comparative contributions to the marital estate and the causes for the breakdown of the marriage, this court finds that the marital estate should be divided equally between the parties, namely 50 per cent to each of them.
V. The distribution of the Marital Estate in Compliance with the Findings in Paragraphs III and IV
The value of the marital estate of the parties ($1,087,982) and the percentage of it which each should receive (50 per cent) having been previously determined, it is now found that plaintiff and defendant shall each receive marital property valued at $543,991.
The following allocations of property are made in "accordance with these findings:
Plaintiff $543,991 . . . . 50%
Entire equity in No. 18 Whitward, ($5,000) Unit 18, Windsor, CT Entire equity in No. 2 Industrial Rd., $84,053 Windsor Locks, CT One-half interest in equity in No. 6 $76,151 Industrial Park, Windsor Locks, CT (T. A. Development) Entire interest in Windsor Marketing Group $758,000 Bank accounts $11,803 I.R.A. West Bank $20,687 CT Page 53 Household furniture — 1989 Alpha Spider $6,000 1991 Ford F150 $8,000 -------- Sub Total $959,694 Less amount due defendant $415,703 -------- Total $543,991
Defendant $543,991 . . . . 50%
Total equity in No. 3 Emerson Lane $90,096 Granby, CT 1990 Volvo $13,225 Household furniture — Bank accounts $2,421 I.R.A. Suffield Savings $22,546 -------- Sub Total $128,288 Balance due from plaintiff $415,703 -------- Total $543,991
VI. Supplemental Orders Relating to the Distribution of the Marital Estate
A. Plaintiff is ordered to convey to defendant all his right, title and interest in No. 3 Emerson Lane, Granby, CT. Defendant in turn will hold plaintiff harmless with regard to all mortgages, taxes and other encumbrances on said property.
B. Plaintiff is ordered to give defendant his promissory note in the amount of $415,703, which note shall bear interest at the rate of 3 per cent per annum and shall be payable in manner and form as follows:
By the payment of the sum of $25,000 together with accrued interest four months from date hereof and by the further payment of a like sum of $25,000 together with accrued interest annually thereafter until May 6, 2004, at which time all then remaining balances of principal and interest shall be fully due and payable.
C. Security for the payment of said note is provided for in the court's subsequent order concerning life CT Page 54 insurance. (See Article VIII C).
D. Each of the parties will execute all documents necessary to carry out the orders of this court.
VII. Orders Concerning the Minor Child Daniel
A. Custody
The parties shall have joint legal custody of the minor child with primary physical custody with the defendant. The plaintiff shall have reasonable rights of visitation including alternating holidays.
B. Support
The plaintiff is ordered to pay as child support the sum of $350 per week. A contingent wage garnishment may issue.
C. Income Tax Exemption
The plaintiff shall have the minor child as an exemption for income tax purposes providing he is current in his support payments, except that at such time as defendant shall have a gross annual income of $17,500 from her employment the parties shall alternate said exemption.
D. Health Insurance
The plaintiff shall maintain health insurance for the benefit of the minor child as the same is available at his place of employment. The parties shall share equally all unreimbursed medical, dental, pharmaceutical, orthodontic and ophthalmological expenses: the provisions of Sec. 46b-84c C.G.S. shall apply.
VIII. Orders concerning the plaintiff
A. Alimony
After considering all the evidence as it relates to Sec. 46b-82 C.G.S. including but not limited to the length of the marriage, thirteen and one half years, CT Page 55 being mindful also that the parties have been separated for almost three years and that the plaintiff has provided financially for the defendant and their child during that time, it is ordered that plaintiff pay alimony to the defendant as follows:
 $450 per week for a period of 2 years from date, $300 per week for a period of 2 years thereafter, and $200 per week for a final period of 2 years.
This order is non modifiable as to both term and amount and will sooner terminate upon the remarriage of the defendant or the death of either party.
It is the court's intention herein to provide the defendant with the means necessary to obtain the training and skills which will ease her transition into the job market.
B. Health Insurance
Plaintiff shall maintain health insurance for the defendant for the maximum period prescribed by law under the provisions of COBRA at the defendant's cost and expense.
C. Life Insurance
The plaintiff shall maintain a life insurance policy upon himself in the minimum amount of $400,000 with the defendant as irrevocable beneficiary during such time as the plaintiff shall be obligated in accordance with the terms of any financial order of this court. Said amount may from time to time be reduced when the total financial obligation of the plaintiff herein shall be less than $400,000.
IX. Other Orders
A. Counsel fees
Because of the previous orders issued by the court, no award of counsel fees is made to either party. B. Liabilities CT Page 56
Each of the parties shall be solely responsible for all debts listed on his or her financial affidavit for all debts listed on his or her financial affidavit and shall hold the other party harmless in that regard.
C. Personal Property
Each of the parties shall have sole title to and possession of all personal property not previously dealt with by this court except that plaintiff shall also have the following items of personal property presently in defendant's possession, namely:
 One picture in dining room Childhood desk Valet Childhood tools Boy school items Waterford Green stem wine glasses Lawnmowers for work Laser light Stereo headphones Ink well Gears horse Coffee maker Childhood pictures Leoman china
D. This court has not included in the marital estate for purposes of distribution stock owned by plaintiff in Crompton Knowles, acquired by him prior to his marriage and valued at $6,500. Title to this stock shall remain solely in the plaintiff.
John D. Brennan State Trial Referee CT Page 57